ZAYRE CORP. *vs.* ATTORNEY GENERAL.[1]

Suffolk.    February 11, 1977. — April 21, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, LIACOS, & ABRAMS, JJ.

*Lord's Day.   Common Day of Rest.   Constitutional Law,* Due process of law, Equal protection of laws, Common day of rest.

Legislative and judicial history of G. L. c. 136, §§ 5 and 6.  [428-432]
When a statute regulating economic activity is challenged on the basis
    that the classifications on which the regulatory scheme is based deny
    those subject to them the equal protection of the laws, the challenger
    must bear the heavy burden of overcoming the presumption of con-
    stitutionality which attaches to that statute.  [432-434]
The exemptions in G. L. c. 136, § 6, to the prohibition in G. L. c. 136,
    § 5, are not so arbitrary and unrelated to legitimate State purposes
    that they deny those subject to the prohibition due process and
    equal protection of law [434-443]; BRAUCHER, J., dissenting, with
    whom KAPLAN, J., joined, on the basis that c. 136, § 6 (29), arbi-
    trarily discriminates against those who sell goods in competition with
    exempted "gift and craft stores," in violation of the Massachusetts
    Constitution [446-448].

---

[1] The complaint named Paul J. Fenton, police chief in the city of Springfield as the defendant "[i]ndividually and as a representative of a class of law enforcement officials and the Commonwealth of Massachusetts." The single justice then allowed the plaintiff's motion to discontinue as against Chief Fenton and to substitute the Attorney General as the party who could adequately represent the interests of law enforcement officials of the Commonwealth. The court has had the benefit of briefs filed amicus curiae by His Excellency, the Governor of the Commonwealth, and the Secretary of Economic Affairs and various other individuals and organizations. We acknowledge with appreciation the assistance given the court by the filing of such briefs.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on December 8, 1976.

The case was reserved and reported by *Wilkins*, J.

*Edward J. Barshak* for the plaintiff.

*Robert V. Greco*, Assistant Attorney General (*Thomas A. Waldron* with him) for the defendant.

*Alfred J. Mainini*, for Christian Civil Liberties Union, amicus curiae, submitted a brief.

*William N. Wheeler & Charles J. Wilkins*, for Church League for Civic Welfare & others, amici curiae, submitted a brief.

*Daniel A. Taylor*, Chief Legal Counsel, & *Marcia Casey March*, Assistant Legal Counsel, for the Governor & another, amici curiae, submitted a brief.

*Joseph A. Sullivan, James P. Loughlin, Robert M. Segal & Richard W. Coleman*, for Massachusetts State Labor Council, AFL-CIO, amicus curiae, submitted a brief.

*Alan S. Kuller*, of New York, & *Daniel F. Cashman*, for Caldor, Inc., amicus curiae, submitted a brief.


LIACOS, J.   Laws which regulate trade and commerce on Sundays have been in existence in this Commonwealth and elsewhere since colonial times. These laws popularly have been known as "Sunday closing laws," "Blue Laws" or "common day of rest laws." They once were challenged unsuccessfully as being unconstitutional in that they reflected an impermissible establishment of religion.[2] Various courts, including the United States Supreme Court, have held that such laws are a valid exercise of State police power. See *McGowan* v. *Maryland*, 366 U.S. 420 (1961). After a relative period of quiescence, new attacks on such laws have been mounted recently. These recent challenges, while recognizing generally that such laws may reflect a valid exercise of State police power, proceed on the theory that the exemptions to the prohibition contained in such laws are so random, arbitrary and unrelated to legitimate

---

[2] See, e.g., *Gallagher* v. *Crown Kosher Super Mkt. of Mass., Inc.*, 366 U.S. 617 (1961), rev'g 176 F. Supp. 466 (D. Mass. 1959).

State purposes that they deny those subject to the prohibition due process and equal protection of law.[3]

Such challenges have met with varying degrees of success.[4] The recent decision of the New York Court of Appeals in *People* v. *Abrahams,* 40 N.Y.2d 277 (1976), declaring invalid that State's Sunday closing law on the grounds that the entire scheme of statutory exemptions was so random and arbitrary as to be in derogation of express constitutional guaranties, has given new hope to those who question the validity of such laws. Soon after that New York decision, a lower court in Connecticut, *Connecticut* v. *Graber,* No. Cr 15-45906 (Conn. C.P. New Britain 1976); as had one in Vermont, *Vermont* v. *Ludlow Supermarket, Inc.,* No. 1085-75 (Dist. Ct. Windham Cir. 1975), proceeded to find constitutional infirmity in their State's statutory scheme.

In apparent reliance on this seeming avalanche of judicial precedent the plaintiff, which heretofore apparently had observed the general prohibition of G. L. c. 136, § 5, the Massachusetts "Blue Laws," opened for business on Sunday, November 28, 1976, the first weekend of the so called Christmas rush, in Springfield. The plaintiff was complained of in a District Court for violations of the statute. The plaintiff closed the following Sunday, December 5 and on December 8 filed a complaint with the county court seeking declaratory and injunctive relief against the enforcement of G. L. c. 136, §§ 5, 6, and the pending criminal prosecutions.

The matter first came on for hearing before a single justice on December 10, 1976. None of the requested relief was granted by him. Nevertheless, the plaintiff and many retailers similarly affected by the statute, opened for business on the two subsequent Sundays, December 12

[3] See, e.g., *People* v. *Abrahams,* 40 N.Y.2d 277 (1976); *Genesco, Inc.* v. *J.C. Penney Co.,* 313 So. 2d 20 (Miss. 1975).

[4] Compare *People* v. *Abrahams, supra; Rutledge* v. *Gaylord's, Inc.,* 233 Ga. 694 (1975), with *Bill Dyer Supply Co.* v. *State,* 255 Ark. 613 (1973); *Genesco, Inc.* v. *J.C. Penney Co., supra.*

and 19. Such business establishments became the subject of over 300 criminal complaints now pending in the District Courts.[5] The record indicates that the plaintiff did not open after Sunday, December 19, that is, after the end of the so called Christmas shopping season.[6] On December 24, the single justice certified a class represented by Zayre Corp. consisting of "retailers who wish to open for business on Sundays" and the case was thereupon reserved and reported without decision to the full court on a statement of agreed facts, appendix and briefs.[7]

The statement of agreed facts shows that the plaintiff is a Delaware corporation which operates thirty-four retail discount department stores in Massachusetts, with usual places of business in Natick and Framingham. The plaintiff also sells a wide variety of merchandise some of which is clearly within the exemptions of G. L. c. 136, § 6, others of which are arguably so, but the great majority of which, in terms of quantity and sales volume, are items whose sale on Sunday is prohibited by § 5.[8]

The members of the plaintiff class include, but are not limited to, various department stores, discount, hardware and home supply stores and the like. The members of the class are typically located in shopping centers, downtown and suburban business areas and "free-standing areas ad-

---

[5] The plaintiff requested injunctive relief again on December 15, but the single justice declined to take any action.

[6] The plaintiff's initial complaint indicated that a sizeable percentage of its annual sales volume is done during the period in question.

[7] We note that the record reveals a substantial divergence of opinion between the Governor of the Commonwealth and the Attorney General of the Commonwealth, local law enforcement personnel, retailers, labor unions and others not only as to the validity of G. L. c. 136, §§ 5, 6, but also as to whether the law ought to continue to be enforced pending resolution of the plaintiff's claim by the courts. These and other factors, including the recent precedent in sister States, arguably favoring the plaintiff's claim, fully justify the wisdom of the single justice in assisting the parties to prepare the record and to reserve and report the matter without decision to the full court.

[8] The relevant statutory provisions are reproduced in an appendix to this opinion.

jacent to highways." A department store in the class may
employ over 150 employees, of which 80 to 100 may be
working at any given time. Other members of the class
may have only two or three employees. Prior to November
28, the class members typically observed the provision
of § 5.

The gravamen of the plaintiff's argument is not only
that the entire scheme of exemptions is arbitrary and not
rationally related to a legitimate State purpose, but also
that certain types of stores, in particular health and sani-
tary supply stores (sometimes called health and beauty
aid stores), as well as certain gift stores, are able to
operate freely on Sunday, either due to the exemptions
in the statute or the pattern of local law enforcement. As
such the claim is that the statute operates in an arbitrary
or irrational manner. As evidence of this, the plaintiff
points to the statement of agreed facts which shows that
in so far as the health and beauty aid stores are concerned,
they tend to be located in areas coextensive with those of
the members of the plaintiff class and typically employ
two to four employees on Sunday. Some, but not all, of
these stores rope off or cover areas containing nonexempt
merchandise.

So far as the so called gift stores are concerned, the
parties agreed that the merchandise in those stores was
different to some extent than merchandise sold by the
plaintiff, but were unable to agree that the goods sold in
these stores were within the exemption of G. L. c. 136,
§ 6 (29). It appears that members of the plaintiff class
sell some items similar to those sold in gift stores. It was
agreed that these gift stores typically are open on Sunday,
have not been prosecuted for violations of § 5 and gen-
erally do not rope off or cover up prohibited classes of
merchandise on Sunday.[9]

The plaintiff also apparently conceded in the statement
of agreed facts that the provisions of G. L. c. 136, §§ 5, 6,

---

[9] The record refers to specific stores in the health and beauty aid
and gift store category.

had, prior to the case, been observed by most, but not all retailers, and had been generally, but not universally enforced.[10]

Having set forth the facts necessary to our decision, we go on to consider whether G. L. c. 136, §§ 5, 6, are constitutionally infirm. It is important to point out that this case does not concern the validity of the law per se in that all sides agree the subject of the legislation is within the police power of the State. All we are concerned with[11] is whether the pattern of exemptions renders the statute in its present form constitutionally infirm. To consider these issues, a consideration of the legislative and judicial history of the statute is of some import.

1. *Legislative and judicial history.* It is not necessary

---

[10] In fact, the record shows that seven CVS stores, which are typical of the health and beauty aid stores, are presently defendants in cases for violations of the statute.

The plaintiff has attempted to strengthen its position by arguing that the irrationality of the classification is illustrated by the pattern of discriminatory enforcement which exists. However, the record shows only that the laws have been generally but not universally enforced. This is not sufficient proof to sustain an allegation of discriminatory enforcement as measured by cases such as *Simonetti* v. *Birmingham,* 55 Ala. App. 163 (Crim. App.), cert. denied, 294 Ala. 192 (1975), and *People* v. *Acme Mkts.,* 37 N.Y.2d 326 (1975). Cf. *Oyler* v. *Boles,* 368 U.S. 448 (1962). Moreover, the record shows that the chief law enforcement officer of the Commonwealth, the Attorney General, directed continuing enforcement of the law even after the hearing before the single justice. Any discrimination which may be shown does not derive from the actions of State officials nor has it been shown to be other than as a result of different municipal policies. This latter factor does not implicate the equal protection clause. *McGowan* v. *Maryland,* 366 U.S. 420 (1961). Thus on this record the plaintiff's argument receives no additional support from the allegations.

It should also be noted here that the record before the single justice at least indicated that the law here was not observed or generally was ineffective, thus bringing this case closer to the facts of *People* v. *Abrahams,* 40 N.Y.2d 277 (1976). However, the facts now before the full court indicate differently.

[11] We do not consider whether a proper class was certified or whether Zayre Corp. is a fit class representative. Neither do we consider the propriety of intervening in pending criminal prosecutions, see *Norcisa* v. *Selectmen of Provincetown,* 368 Mass. 161 (1975), both because the Attorney General has not urged this and because of the importance of the question presented. Cf. *Sosna* v. *Iowa,* 419 U.S. 393, 396-397 & n.3 (1975).

to detail the complete history of Sunday closing laws either in the United States or Massachusetts. The former task was done in both the main opinion, and in the separate opinion of Mr. Justice Frankfurter, in *McGowan* v. *Maryland,* 366 U.S. 420, 459 (1961), and the latter was adverted to in the Frankfurter opinion and set forth in greater detail by the minority members of the Governor's Special Committee to Consider the Laws Relative to Lord's Day Observance. 1962 Senate Doc. No. 404, 17-27. It is sufficient to state that Massachusetts has had such a law since 1650. *Id.* at 17. See *McGowan* v. *Maryland, supra* at 545-546, app. I to opinion of Frankfurter, J.; Note, a General Survey of the Sunday and Holiday Laws in New England, 39 B.U.L. Rev. 553 (1959). The general philosophy of the various enactments and versions of the Sunday law up to and including the present G. L. c. 136 is to begin with a general prohibition of all work, labor and amusements on Sunday and then to engraft on that general prohibition the exemptions which the Legislature deems required by necessity or the general purpose of the statute. As noted by the minority members of the special committee, this process of engrafting exemptions has been both active and continuous in the Twentieth Century.[12] 1962 Senate Doc. No. 404 at 18.

The seminal event concerning our view in this case occurred in 1961, when the United States Supreme Court reversed the decision of a three-judge Federal District Court and upheld the prior version of the Massachusetts Sunday law in *Gallagher* v. *Crown Kosher Super Mkt. of Mass., Inc.,* 366 U.S. 617 (1961), rev'g 176 F. Supp. 466 (D. Mass. 1959). In that case, the statute at issue was challenged on grounds that it constituted an establishment of religion or inhibited the free exercise thereof and further that the exemptions to the law were so numerous and arbitrary as to have no rational basis. 366 U.S. at 622 &

---

[12] "Indeed since 1900 few yearly legislative sessions have failed to add at least one new provision concerning Sunday activities to the Massachusetts statutes."

n.2. The Court in *Gallagher,* as it did in *McGowan* v. *Maryland, supra,* rejected the equal protection challenges as well as the other challenges. It held as to equal protection that the plaintiffs there had not sustained their burden on the issue of irrationality sufficient to overcome the presumption of validity which attaches to statutes regulating economic activity. *Gallagher* v. *Crown Kosher Super Mkt. of Mass., Inc., supra* at 624.

Less than one month after the decision in *Gallagher,* this court, in reliance on that decision and prior decisions of this court, *Commonwealth* v. *Chernock,* 336 Mass. 384 (1957); *Commonwealth* v. *Has,* 122 Mass. 40 (1877), held G. L. c. 136, §§ 5, 6, constitutional and rejected, as had the Supreme Court, the contention that the exemptions in § 6 had destroyed any rational basis for § 5. *Commonwealth* v. *Chamberlain,* 343 Mass. 49, 53 (1961). In *Chamberlain,* the court held that in the absence of sufficient proof showing the irrationality of the scheme of exemptions, the question of the number of exemptions to the prohibition was a subject for "legislative determination."[13]

Nonetheless, the earlier action of the lower Federal court (as it had in 1960, see 1960 Senate Doc. No. 525, see also the earlier study in 1954 House Doc. No. 2413) provided another reason for restudying Sunday closing laws. This resulted in the formation of the 1962 committee whose task it was to review the statute in order "to remove the inequities and inconsistencies of the present law while preserving its form and substance insofar as practical and reasonable as a uniform day of rest law." 1962 Senate Doc. No. 404 at 3. The end result of the committee's proposal was the enactment of St. 1962, c. 616, § 2, now G. L. c. 136, §§ 5, 6.

The measure proposed by the committee's majority contained over twenty-five exemptions. The bill which was

---

[13] See Annot., 57 A.L.R.2d 975 (1958), for collection of cases where similar challenges were made in State and Federal courts prior to *McGowan.*

finally enacted contained forty-three. Even the bill proposed by the minority members contained almost fifteen exemptions. The substance of the majority proposal was enacted in St. 1962, c. 616, § 2. Among the exemptions added to the committee's proposal were those which seemingly furthered the purpose of the law such as allowing the opening of libraries and public bathhouses, as well as the sale of certain merchandise which was primarily recreational in character. As the committee indicated had been past practice, however, there was a continuing legislative effort to balance societal needs with the underlying policy of the law. The Legislature has enacted fifteen different amendments to § 6,[14] bringing the total number of exemptions up to forty-nine. Among those exemptions added were the operation of coin-operated laundries and car washes as well as the sale of State lottery tickets.

The law enacted in 1962 did not differ markedly from the law upheld in both *Gallagher* and *Chamberlain*. See text in *Gallagher* v. *Crown Kosher Super Mkt. of Mass., Inc., supra* at 636-639 (app. to opinion of Warren, C.J.). Indeed, one of the exemptions which the plaintiff finds particularly egregious, G. L. c. 136, § 6 (27), is almost identical to one contained in the earlier enactment. The exemption now allows "[t]he retail sale of drugs and medicines and the retail sale or rental of mechanical appliances prescribed by physicians or surgeons, and the retail sale of personal health and sanitary supplies." G. L. c. 136, § 6 (27), as appearing in St. 1962, c. 616, § 2. Only the last clause, relating to the sale of health and sanitary supplies differentiates that provision from the one before the courts in both *Gallagher* and *Chamberlain*. The earlier law however contained no "giftshop" provisions, see G. L. c. 136, § 6 (29).

Of the forty-nine exemptions now in the statute, thir-

---

[14] See St. 1963, c. 230; St. 1964, c. 9; St. 1964, c. 216; St. 1965, c. 243; St. 1965, c. 370; St. 1965, c. 488; St. 1967, c. 311; St. 1968, c. 340; St. 1968, c. 392; St. 1969, c. 267; St. 1970, c. 76; St. 1970, c. 309; St. 1972, c. 675; St. 1974, c. 219; St. 1975, c. 697.

teen concern the subject of retail sales,[15] six concern the transportation of persons and property,[16] seven concern recreational activity,[17] four concern the operation of hotels and restaurants,[18] three exempt self-service activity requiring no outside labor presence,[19] four exempt public service and emergency activity,[20] and the remainder do not fit into any one category.[21]

2. *General principles.* The principles of law governing this case are both familiar and oft stated, see, e.g., *New Orleans* v. *Dukes,* 427 U.S. 297 (1976); *Williamson* v. *Lee Optical of Okla., Inc.,* 348 U.S. 483 (1955); *Railway Express Agency, Inc.* v. *New York,* 336 U.S. 106 (1949); *West Coast Hotel Co.* v. *Parrish,* 300 U.S. 379 (1937); *First Nat'l Bank* v. *Attorney Gen.,* 371 Mass. 773, 793-794 (1977); *Pinnick* v. *Cleary,* 360 Mass. 1 (1971); *Commonwealth* v. *Chamberlain, supra.* When a statute regulating economic activity is challenged on the basis that the classifications on which the regulatory scheme is based deny those subject to them the equal protection of the law the challenger must bear the heavy burden of overcoming the presumption of constitutionality which attaches to that statute. *Commonwealth* v. *Henry's Drywall Co.,* 366 Mass. 539 (1974). Unless a classification is a "manifest excess of legislative power," *Mobil Oil Corp.* v. *Attorney Gen.,* 361 Mass. 401, 412-413 (1972), unjustified by any conceivable set of facts or findings, *Marshal House, Inc.* v. *Rent Control Bd. of Brookline,* 358 Mass. 686 (1971), or unless the

---

[15] G. L. c. 136, § 6 (2), (10), (17), (18), (20), (24)-(30), (47).

[16] G. L. c. 136, § 6 (31)-(35), (49).

[17] G. L. c. 136, § 6 (11)-(16), (19).

[18] G. L. c. 136, § 6 (22), (36), (42), (43).

[19] G. L. c. 136, § 6 (45), (46), (48).

[20] G. L. c. 136, § 6 (3)-(5), (41).

[21] See, e.g., G. L. c. 136, § 6 (1) uncompensated work; (6) activities requiring continuous production; (8), (23), exemption for those observing Saturday sabbath; (40) work incidental to religious exercise and some legal work.

statute "trammels fundamental personal rights or is drawn upon inherently suspect distinctions," *New Orleans* v. *Dukes, supra* at 303, a court will not or should not invalidate a classification which is rationally related to a legitimate State interest.[22] *First Nat'l Bank* v. *Attorney Gen., supra. Pinnick* v. *Cleary, supra.*

The reasons for this devolve not from an abdication of the judicial role, but a recognition of its proper place in our system of government. Cf. *Lochner* v. *New York,* 198 U.S. 45 (1905). See *West Coast Hotel Co.* v. *Parrish,* 300 U.S. 379 (1937). This principle of judicial restraint includes recognition of the inability and undesirability of the judiciary substituting its notions of correct policy for that of a popularly elected Legislature. *Ferguson* v. *Skrupa,* 372 U.S. 726 (1963). Thus, along with the deference to the classification per se, a court will not invalidate a classification merely because the Legislature has not chosen to address an entire problem in defining a classification, *Railway Express Agency, Inc.* v. *New York, supra; Williamson* v. *Lee Optical of Okla., Inc., supra,* or because the classifications, be they slightly over or under inclusive, could have been drawn to more precise standards, *New Orleans* v. *Dukes, supra.* Compare *Hall-Omar Baking Co.* v. *Commissioner of Labor & Indus.,* 344 Mass. 695 (1962). Every economic classification is in some manner arbitrary but the drawing of the line between classifications is a task

---

[22] There has been a suggestion in some of our prior decisions that, in regard to the equal protection concept, the Federal decisions may reflect a standard of review less restrictive than that required by the Massachusetts Declaration of Rights. See *Corning Glass Works* v. *Ann & Hope, Inc.,* 363 Mass. 409, 416 (1973); *Hutcheson* v. *Director of Civil Serv.,* 361 Mass. 480, 490 (1972). It is not necessary here to explore such possible distinction as the common day of rest cases previously decided by this court apply the same standard as the Federal courts. See *Jewel Cos.* v. *Burlington,* 365 Mass. 274 (1974); *Commonwealth* v. *Chamberlain,* 343 Mass. 49 (1961). See also *Hall-Omar Baking Co.* v. *Commissioner of Labor & Indus.,* 344 Mass. 695, 700 (1962), where we stated: "If a rational basis may be discerned for distinguishing between businesses which in many respects are similar, Sunday closing laws which exempt some such businesses are not unconstitutional because of the exemptions. *McGowan* v. *Maryland* . . . ."

to be exercised at the discretion of the appropriate branch of government. That branch of government in our system is the Legislature.

3. *The application of the principles to G. L. c. 136, §§ 5, 6.* Perhaps in no other area is the need for this allocation of power better illustrated than in the instant case. "In the case of Sunday legislation, an extreme complexity of needs is evident. This is so, first, because one of the prime objectives of the legislation is the preservation of an atmosphere — a subtle desideratum, itself the product of a peculiar and changing set of local circumstances and local traditions. But in addition, in the achievement of that end, however formulated, numerous compromises must be made. Not all activity can halt on Sunday. Some of the very operations whose doings most contribute to the rush and clamor of the week must go on throughout that day as well, whether because life depends upon them, or because the cost of stopping and restarting them is simply too great, or because to be without their services would be more disruptive of peace than to have them continue. Many activities have a double aspect: providing entertainment or recreation for some persons, they entail labor and workday tedium for others." *McGowan* v. *Maryland,* 366 U.S. at 524-525 (opinion of Frankfurter, J.). See *Two Guys from Harrison-Allentown, Inc.* v. *McGinley,* 366 U.S. 582 (1961); *Braunfield* v. *Brown,* 366 U.S. 599 (1961).

The legislative dilemma in deciding the provisions of a common day of rest law is evident. On the one hand, there is the general policy for such a day such as that established in § 5. See G. L. c. 136, § 1. On the other hand, there is a recognition that certain activities must, for societal needs, be allowed to continue; that allowing certain activities will facilitate, not frustrate, the attainment of that goal and that in some instances the potential economic loss resulting from Sunday prohibition will far outweigh the benefits to be gained in furtherance of the general policy. In addition, a Legislature could decide that the benefits to be gained could be more than outweighed by the costs in terms of fair, even-handed law enforcement

due to the difficulty of enforcing some prohibitions. *Mc-Gowan* v. *Maryland, supra* at 526 (Frankfurter, J.).[23]

We are aware of course that in an analogous situation the distinguished Court of Appeals of New York reached a contrary conclusion in *People* v. *Abrahams, supra.* However, the nature of the particular statute involved, its legislative history and the context within which the case arose lessen the degree to which it may be considered persuasive.

*Abrahams* arose less than a year after the same court in *People* v. *Acme Mkts.,* 37 N.Y.2d 326 (1975), reversed a conviction under the New York "Sunday" law due to a pattern of discriminatory enforcement. Thus, *Abrahams* was decided in that context as well as a finding of prosecutorial indifference to enforcement of the law. See *Simonetti* v. *Birmingham,* 55 Ala. App. 163 (Crim. App.), cert. denied, 294 Ala. 192 (1975). The court also found that the law was flouted regularly by the public.

On the other hand, the record in this case is to the contrary. The statement of agreed facts indicates that the law has been generally respected, and that there has been a general but not uniform pattern of enforcement by the prosecuting authorities. In addition the *Abrahams* case suggests that the exemptions under the New York law were so numerous that Sunday was a day of rest in name only. Here, on the other hand, to the extent the plaintiff has offered any proof, we cannot conclude that the law does not accomplish its purpose. Thus, it is clear that, here, unlike the statute in New York, the law accomplishes its goal to a substantial degree.

In addition, the New York law invalidated in *Abrahams* evolved from a format conceived in 1881. In this Common-

---

[23] It is arguable that a State Supreme Court reviewing a State statute should or could exercise more latitude in evaluating the efficacy of legislative judgments than should a Federal court in the same position for reasons of comity. *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U.S. 61 (1911). However, the underlying rationales, discussed *supra* for such deference in the Federal courts, are equally applicable within the confines of our own system. See our prior comment, note 22, *supra.*

wealth, however, not only were there studies in 1953, 1960 and 1962 (see text *supra* at 430), but there was a complete revision of the law as a result of the last cited study. Moreover, not only did the New York statute differ in its various provisions from G. L. c. 136, a not inconsequential factor, but the New York court was influenced heavily by local experience in the administration of the statute.[24] To the extent both of these factors were critical to the decision in that case, we find that the particular provisions of our statute and our own experience with it do not weigh as heavily on the side of finding constitutional infirmity as they did in New York.[25]

The underlying legal standard set forth by the New York court was that the exemptions were "utterly lacking in cohesive scheme," *People* v. *Abrahams, supra* at 285.

Whether this imports a different legal standard of review is a matter open to debate. We note that elsewhere the Court of Appeals refers to the familiar standard of judicial review which we utilize here.[26] Since each State court must examine a challenged statute in light of its own constitutional requirements (as well, perhaps under the Federal constitutional requirements) on the particular record placed before it, we consider *Abrahams* to be illuminating but not controlling. It seems clear to us that the substantial differences in history, experience and statutory structure, as well as the record before a court, make each

---

[24] The importance of both of these factors is well illustrated in Judge Fuchsberg's concurring opinion where he details the difficulty of defining the application of the New York statute to laundries. 40 N.Y.2d at 288. Cf. *Commonwealth* v. *Chamberlain, supra.* See St. 1967, c. 311 (exempting coin-operated, self-service laundries).

[25] It should also be noted that New York, unlike Massachusetts, did not have the benefit of a Supreme Court ruling on the constitutional propriety of its basic statutory scheme.

[26] "Respect for legislative wisdom and prerogatives as well as a proper sense of judicial power compels deference to enactments which are rationally related to the intended purpose. Consequently unconstitutionality on the grounds of irrationality is the weakest ground for striking down a statute and is seldom used." *People* v. *Abrahams, supra* at 285.

decision one which is the peculiar responsibility of the State court before which such an issue is raised.

The process of balancing the various social and economic factors which influence the provisions of a common day of rest law calls for local legislative judgments as to the desirability, necessity or lack thereof of certain activities. The Constitution requires only that in making these legislative judgments and in conducting any subsequent amendatory process the Legislature have a rational basis for making a judgment. *Gallagher, McGowan,* and *Two Guys* explicitly support this view as the appropriate standard.

Thus, it is our task to consider whether the plaintiff has demonstrated a lack of any conceivable basis to the challenged exemptions, particularly (27) and (29).[27] We conclude that it has not met this burden.

The principles set forth above suggest the ultimate resolution of this case in light of the plaintiff's two major lines of attack on the facial validity of the statute. The first such attack, that the purpose of the general prohibition in G. L. c. 136, § 5, has been "so altered and obscured by the accumulation of statutory classifications and exemptions under § 6" with such classifications being unrelated to any legitimate State purpose can be disposed of readily.

The obvious State purpose is to provide a uniform day of rest and relaxation. If the exemptions were so numerous in operation as to defeat substantially that goal or if they were either inherently incapable of adequate enforcement or were in fact not being so enforced, see *People* v. *Acme Mkts., supra; Simonetti* v. *Birmingham, supra,* we could assume, without deciding, that there might be substantial merit to the plaintiff's argument. If this was the case however, the plaintiff has not proved it. Cf. *First Nat'l Bank* v. *Attorney Gen., supra.* Instead, all it has succeeded

---

[27] The case of *Morey* v. *Doud,* 354 U.S. 457 (1957), suggested at least a lesser if not a shifted burden in a challenge to a closed ended classification such as the exemptions in G. L. c. 136, § 6. However, the plaintiff can draw no support from the case anymore as it has been overruled in *New Orleans* v. *Dukes, supra.*

in proving is a general, if not uniform, pattern of compliance and enforcement with the law. It has also succeeded in proving, in the only matters where it did adduce any evidence, that a miniscule percentage of retail outlets come within the specific exemptions. In light of this record we can only conclude that the law even with its forty-nine exemptions accomplishes its purpose in substantial part, that is, to provide a common day of rest. As such, it cannot be said that the exemptions in operation are so numerous as to obscure any legitimate State purpose.

It is true that the entire scheme of objections cannot be called "cohesive." Our response to that is that logical symmetry is not required under either the State or United States Constitutions, *Gallagher* v. *Crown Kosher Super Mkt. of Mass., Inc., supra, Commonwealth* v. *Chamberlain, supra.* So long as the particular exemptions have a rational basis consistent with the statutory purposes they will pass constitutional muster.

On this level, the record in the case does not allow us to say that any particular exemptions are entirely without conceivable justification. *Marshal House, Inc.* v. *Rent Control Bd. of Brookline,* 358 Mass. 686, 695 (1971).

Two factors must be pointed out in this regard. First, in so far as only thirteen of the forty-nine exemptions apply to retail sales, we question whether the plaintiff has standing to raise the alleged irrationality of the remainder, once it is found that the existence of these others does not destroy the statutory purpose. *Supreme Council of the Royal Arcanum* v. *State Tax Comm'n,* 358 Mass. 111 (1970).[28]

---

[28] For example, we do not see how the plaintiff has standing to raise the fact that a lawyer may only prepare for trial, but not do other work. Even if it does, the Legislature could have concluded that, given the opening of court Monday morning and the necessities of trial preparation, the potential harm from forbidding such activity outweighed the benefit to the public good from its prohibition, in view of the necessity to operate a court system with adequately prepared lawyers.

Moreover, the plaintiff points out that we may see an X-rated movie on Sunday and buy a newspaper, but may not purchase a magazine or Bible. While this is true, it should be noted that a person may also

The second factor is that apart from exemptions (27) and (29), on which evidence was produced, the plaintiff has not introduced any evidence as to the operation of the others. Thus, even if it had standing to raise the invalidity of those exemptions beyond the purpose for which we have recognized it, the deficiencies in the record would preclude our finding that the presumption of constitutionality had been overcome. *McGowan* v. *Maryland, supra.* See *Mobil Oil Corp.* v. *Attorney Gen.,* 361 Mass. 401, 419 (1972) (Hennessey, J., dissenting); *Gallagher* v. *Crown Kosher Super Mkt. of Mass., Inc., supra.* See also note 28, *supra.*

As to the exemptions relative to retail sales other than those involved in (27) and (29), we see no reason to depart from the reasoning of *Gallagher* where it was said, "Many of the exceptions in the Massachusetts Sunday Laws are reasonably explainable on their face. Such items as tobaccos, confectioneries, fruits and frozen desserts could have been found by the legislature to be useful in adding to Sunday's enjoyment; such items as newspapers, milk and bread could have been found to be required to be sold fresh daily. It is conceivable that the legislature believed that the sale of fish and perishable foodstuffs at wholesale would not detract from the atmosphere of the day, while the retail sale of these items would inject the distinctly commercial element that exists during the other six days of the week." 366 U.S. at 622-623.

Many of the exemptions relating to retail sales in § 6 pass constitutional muster by a similar rationale. For example, exemption (2) allowing food stores employing

see "My Fair Lady" or "The Sound of Music" on Sunday. More importantly, the Legislature could have reasoned in regard to movies that their allowance would add to, rather than detract from, the character of the day. In addition, in so far as there is a special provision for newspapers, the Legislature could have reasoned that they must be sold on a daily basis without exception to preserve their value, but the same was not necessary for magazines or books. If such distinctions are irrational in operation, the record does not show it. *Gallagher* v. *Crown Kosher Super Mkt. of Mass., Inc., supra* at 623. Similar rationales could be devised for the other "inconsistencies and contradictions" pointed out by the plaintiff, but in regard to most, nothing in the record demonstrates the correctness of the plaintiff's contentions.

three or less employees to remain open accounts for the societal need to have such products available on a continuing basis, yet limits the impact on the labor force and the tranquility of the day by restricting the size of the store which may so operate. See *State* v. *S.S. Kresge, Inc.,* 364 A.2d 868 (Me. 1976). See also *Giant of Md. Inc.* v. *State's Attorney for Prince George's County,* 267 Md. 501, appeal dismissed, 412 U.S. 915 (1973). Similarly, the Legislature may have reasoned that it was necessary that gasoline could be available on Sunday, to further transportation for recreational purposes, but that other items necessary for a motor vehicle were not needed unless their purchase would facilitate the actual operation of the motor vehicle on that day, thus accounting for exemption (18) allowing the sale of these needs on an emergency basis. Again, the end result is that the plaintiff has not gone beyond the point of bare assertion of irrationality in regard to these exemptions as a means of substantiating its argument. In the absence of more, the presumption of validity prevails.

The record is more adequate, however, concerning exemptions (27) and (29). As previously noted, exemption (27)[29] is identical to the clause before the court in *Gallagher* with the addition of the proviso for personal health and sanitary supplies. In so far as this latter addition is concerned the Legislature may have reasoned that people needed access to such supplies and that stores primarily engaged in selling such supplies would not present a great threat to the public order of the day. *Two Guys from Harrison-Allentown, Inc.* v. *McGinley, supra.* The record does nothing to rebut this.

The statement of agreed facts lists items carried by both the plaintiff and stores engaged in the type of trade or commerce in exemption (27). It is clear that many of

---

[29] "(27) The retail sale of drugs and medicines and the retail sale or rental of mechanical appliances prescribed by physicians or surgeons, and the retail sale of personal health and sanitary supplies."

the items are clearly health and sanitary supplies. It is also clear that many are not.

However, the Legislature may have decided that only certain stores would find it economically viable to remain open with the other restrictions and that within this class the difficulties of enforcement, in so far as the selling of prohibited merchandise is concerned, did not outweigh the public benefit. While the record indicates that stores have not been uniform in their practices, and neither have law enforcement officials, a mere lack of uniformity is not sufficient proof to demonstrate the impossibility of enforcement. Cf. *Simonetti* v. *Birmingham, supra.*

In addition, the record supports rather than negates any judgment the Legislature may have made as to the effect of this provision in two ways. The record states that the greater value of items in terms of quantity and sales volume carried by members of the plaintiff class are nonexempt items from which an inference can be drawn that it is economically unviable for such stores to open on Sunday for purposes of selling only the exempted merchandise. The plaintiff has not demonstrated that the stores primarily engaged in selling drugs and health and beauty items are at a similar disadvantage. This factor suggests that the Legislature was aware of the impact of the exemption and so intended it. Cf. *Two Guys from Harrison-Allentown, Inc.* v. *McGinley, supra* at 591. The record shows that stores open under exemption (27) generally employ two to four employees whereas members of the plaintiff class may employ 80 to 100 on any given day. While it is true that other members of the plaintiff class may also employ no more than two or three employees, the existence of "some inequality" as a result of the classification is insufficient to strike down the entire statutory scheme. Cf. *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U.S. 1, 51 (1973). Substantial distinctions between classes may be made with less than mathematical exactitude as long as there is some basis for the classification in the first place. *New Orleans* v. *Dukes,* 427 U.S.

297, 303 (1976). The plaintiff has not shown the absence of this basis.

Similar insufficiency in the record precludes any successful attempt to challenge exemption (29)[30] as irrational. The statement of agreed facts concedes that many of the items sold by stores which the plaintiff claims have been exempt under exemption (29) are readily distinguishable from items sold by the plaintiff class members. However, the parties differ as to whether such items fall within the exempt class of merchandise. There is nothing in the record suggesting (other than a reference to forty specific stores) how many of these stores are in fact open on Sunday or how many employees are typically employed in any one of these stores. Thus, even if we were judicially to notice that the outlets referred to by the plaintiff were larger than "the quaint Cape Cod tourist shop or the cozy Berkshire County antique store" (which it is argued forms the original basis for the exemption), we cannot say on the facts before us that the two classes are so similar in terms of their impact on the Sunday closing scheme that the distinction between them and the members of the plaintiff class is arbitrary, irrational or invidious. See *Vigeant* v. *Postal Tel. Cable Co.*, 260 Mass. 335 (1927); *Hall-Omar Baking Co.* v. *Commissioner of Labor & Indus., supra.*

The plaintiff's attack must fail for another reason. Much of the argument in its brief is directed at the impossibility of defining the class of exempt merchandise under exemption (29). However, that argument misapprehends the nature of the classification set forth. The exemption in question is not a blanket exemption for "gifts, souvenirs, antiques, hand crafted goods and art goods," but for the outlets that sell them, restricting its applicability to stores, "primarily engaged in the sale of such merchandise, or on

---

[30] "(29) The sale, at retail, of gifts, souvenirs, antiques, hand crafted goods and art goods, in an establishment primarily engaged in the sale of such merchandise, or on the premises of a licensed common victualler." G. L. c. 136, § 6 (29), as appearing in St. 1962, c. 616, § 2.

the premises of a licensed common victualler." The rationality of the latter finds implicit support in *Jewel Cos.* v. *Burlington,* 365 Mass. 274 (1974). In so far as the exemption is concerned, the Legislature may well have concluded that such stores would derive most of their business from both inter- and intra-State tourism, much of which takes place on weekends. Thus, the Legislature well may have concluded that the purposes of the Sunday law are facilitated by allowing such stores to be open. Also, it would not be an unjustifiable conclusion that the harm of requiring such stores to close would outweigh the potential benefits to the vitality of the tourism industry as well as to the desired character of the day.

Finally, it is indeed possible that the Legislature could have determined that, although many retailers sell items which might fall within the class set forth in exemption (29), to permit only those who are primarily engaged in such trades to open on Sunday would serve both the purpose of having them available to the consuming public on Sunday and at the same time limit the nature and amount of commercial activity attendant on their sale. Cf. *Gallagher* v. *Crown Kosher Super Mkt. of Mass., Inc., supra.* See also *Two Guys from Harrison-Allentown, Inc.* v. *McGinley, supra.* Thus, we cannot conclude on this record that the operation of exemption (29) effectuates an irrational, arbitrary or invidious discrimination against the plaintiff class.

4. *Conclusion.* Our purpose in this opinion is not to commend or condemn the legislative policies which have resulted in the evolution of G. L. c. 136, §§ 5, 6, or to commend the current statute as a model of clarity and precision.[31] The current statute may be viewed as having faults

---

[31] The record indicates that Massachusetts businesses may suffer an economic disadvantage due to the fact that the surrounding States of New York, New Hampshire, Connecticut and Rhode Island (in part, see R.I. Gen. Laws § 5-23-2 [Supp. 1976]) do not, as of now, have valid and enforceable common day of rest laws. Such economic factors do not affect the resolution of the constitutional issues in this case; rather these are factors which only the Legislature may properly consider.

within it. However, these faults are not equivalent to constitutional infirmity. Our task has been to ascertain whether the classifications violate the constitutional rights of the plaintiff. Our examination of both the law and the record has led us to the conclusion that they do not.

A judgment shall be entered accordingly.

*So ordered.*

BRAUCHER, J. (dissenting, with whom Kaplan, J., joins). I agree with much of what the court says, but not with its conclusion. In particular, I agree that the statement of agreed facts does not establish that G. L. c. 136, §§ 1-11, the Common Day of Rest Law, violates the Constitution of the United States. I also agree that the plaintiff's attack on the entire statute as a "hodge-podge" fails, and that § 6 (27) has not been shown to be invalid as it affects "super drugstores" and those competing with them. But I think it is established that § 6 (29) arbitrarily discriminates against members of the plaintiff class who sell goods in competition with the exempted "gift and craft stores," and that such discrimination violates our State Constitution.

1. *Federal law.* Sunday laws undoubtedly had a "strongly religious origin," but as presently written and administered most are "of a secular rather than of a religious character" and hence do not violate constitutional provisions relating to the establishment of religion. *McGowan* v. *Maryland,* 366 U.S. 420, 433, 444 (1961). *Commonwealth* v. *Has,* 122 Mass. 40, 42 (1877). The Massachusetts statutes were upheld against attack under the First and Fourteenth Amendments in *Gallagher* v. *Crown Kosher Super Mkt. of Mass., Inc.,* 366 U.S. 617 (1961). Cf. *Commonwealth* v. *Chamberlain,* 343 Mass. 49 (1961) (Fourteenth Amendment). The litigation led to a comprehensive study and revision of what is now the "Common Day of Rest Law." 1962 Senate Doc. No. 404. G. L. c. 136, §§ 1-11, enacted by St. 1962, c. 616, § 2, and subsequently amended. Neither the *Gallagher* case nor the

*Chamberlain* case involved the precise questions now before us, but I agree with the court that *New Orleans* v. *Dukes*, 427 U.S. 297 (1976), makes it clear that a stronger showing than that now made would be needed to establish a violation of the equal protection clause of the Fourteenth Amendment.

2. *The State Constitution.* On issues with respect to "Part II, c. 1, § 1, art. 4, of our State Constitution, as limited by arts. 1, 7, 10 and 12 of its Declaration of Rights ... of course, we are not bound by Federal decisions, which in some respects are less restrictive than our Declaration of Rights." *Corning Glass Works* v. *Ann & Hope, Inc.*, 363 Mass. 409, 416 (1973), and cases cited. Under the State Constitution, we may properly examine with care a statute "utterly lacking in cohesive scheme," even though individual clauses of the statute could with ingenuity be found to have a variety of possible rational bases. *People* v. *Abrahams*, 40 N.Y.2d 277, 284-285 (1976). See *Hall-Omar Baking Co.* v. *Commissioner of Labor & Indus.*, 344 Mass. 695, 708-709 (1962), where we found it unnecessary to reach a similar question. Here a cohesive scheme can be found in the statute, but distinctions drawn along lines irrelevant to the purposes which the statute seeks to accomplish may be arbitrary and invalid. *Id.* at 707.

Even if the statute is not utterly lacking in cohesive scheme, our Constitution requires that "statutes in regard to the transaction of business must operate equally upon all citizens who desire to engage in the business, and that there shall be no arbitrary discrimination between different classes of citizens." *Commonwealth* v. *Hana*, 195 Mass. 262, 266 (1907) (hawkers' and pedlers' law), quoted in *Hall-Omar Baking Co.* v. *Commissioner of Labor & Indus.*, 344 Mass. 695, 701 (1962).

3. *"Hodge-podge."* The plaintiff class consists of retailers who wish to open for business on Sundays. As to such retailers, most of G. L. c. 136, § 6, follows a rational and cohesive pattern. Most of the exemptions can be justified as "necessary either for the health of the populace or for the enhancement of the recreational atmosphere of

the day." *McGowan* v. *Maryland, supra* at 426. At the same time there is recognition, in § 6 (2), on foodstuffs, that Sunday sales by a small store make less of an inroad on that atmosphere than sales from a larger store. Thus I agree with the court, though for different reasons, that the attack on the statute as a whole has insufficient support in the record. The question remains, however, whether § 6 (27) and (29), the two exemptions particularly assailed by the plaintiff, fit the statutory scheme.

4. *"Super drugstores."* Section 6 (27), inserted in 1962, added to the traditional exemption for drugs and medicines a further exemption for "the retail sale of personal health and sanitary supplies." The plaintiff complains of the vagueness and ambiguity of "personal . . . sanitary supplies," and argues that the door is opened to Sunday sales by "super drugstores" of items not within the exemption. But it is not irrational to associate sanitation with health. Moreover, so far as the statute is concerned, the members of the plaintiff class are as free as any drugstore to sell the exempted items on Sunday and to test the limits of the exemption. If they find such sales uneconomic because of the way they choose to conduct their businesses, that fact does not establish arbitrary discrimination by the Legislature. Nor do they make out a case of arbitrary or discriminatory enforcement; it is agreed that some "super drugstores" are now defendants in criminal cases for violation of the Sunday law. I therefore agree with the court that § 6 (27) has not been shown to be unconstitutional.

5. *"Gift and craft stores."* Section 6 (29), inserted in 1962, exempts: "The sale, at retail, of gifts, souvenirs, antiques, hand crafted goods and art goods, in an establishment primarily engaged in the sale of such merchandise, or on the premises of a licensed common victualler." The stores which take advantage of this exemption include chains of stores located in shopping centers and business areas; these "gift and craft stores" sell many of the same categories and items of such merchandise as the members of the plaintiff class, but the latter are not "primarily

engaged" in making such sales. Thus a store in the plaintiff class is subject to prosecution for selling on Sunday a "gift" which would be exempt if sold by a "gift and craft store." None of the parties refers to the possibility that the plaintiff could avoid the difficulty by taking out a common victualler's license, and we do not consider that possibility. See G. L. c. 140, §§ 1-21.

Since almost any article might be a "gift," there is an inherent uncertainty in the scope of the exemption. The statute is a criminal statute, and the court cannot extend it to offenses not created by its language. *Commonwealth* v. *Alexander*, 185 Mass. 551, 553 (1904). A deed is not to be declared a crime upon ambiguous words or by a strained construction. *Ralph's Mkt., Inc.* v. *Beverly*, 353 Mass. 588, 590 (1968).

One may speculate that the Legislature intended to exempt what the plaintiff calls "the quaint Cape Cod tourist shop or the cozy Berkshire County antique store," together with the gift shop in the roadside restaurant or motel. Such an exemption might be thought to contribute to the recreational atmosphere of the day. But the exemption is not drawn in such terms; it does not refer to size, location or setting. In a shopping center or business area, an attempt to distinguish generally between recreational shopping and serious shopping lacks plausibility. The exemption must be evaluated in terms of its present discriminatory effect. *Hall-Omar Baking Co.* v. *Commissioner of Labor & Indus.*, 344 Mass. 695, 703-704 (1962). *Vigeant* v. *Postal Tel. Cable Co.*, 260 Mass. 335, 342 (1927). So evaluated, it fails the test. As it affects the plaintiffs, it relates neither to health nor to recreational atmosphere.

This conclusion is not contrary to our decisions in *Mobil Oil Corp.* v. *Attorney Gen.*, 361 Mass. 401 (1972), and *Jewel Cos.* v. *Burlington*, 365 Mass. 274 (1974). In the *Mobil Oil* case we upheld a prohibition of the use of games of chance in connection with sales by a dealer or seller of motor vehicle fuel, even though it did not apply to competing sellers of other goods. There was no direct prohibition of sales by gasoline stations, and no showing of a loss

of business to their competitors as a result of the statute (at 418). Even so, two Justices dissented. In the *Jewel* case we upheld a requirement that food stores close at 10 P.M. despite an exemption for common victuallers and despite the fact that the plaintiff food store sold nonfood items in competition with stores not subject to the requirement. There was testimony that the requirement produced no noticeable difference in gross weekly sales, and it had some basis in actual experience with disturbance of nearby residents (at 276, 279-280). Neither case upholds arbitrary discrimination between competitors where the impact is direct and clear.

The exemption has been in existence for some fifteen years, and one may doubt that the growth of large chains of "gift and craft stores" fully explains the present challenge. The record suggests that two additional factors contributed. First, the Sunday laws in the States on our borders have recently become inoperative, and many members of the plaintiff class are located near a State border and are in competition with stores in other States. Second, the problem came to a head in the Christmas shopping season, during which many retailers make a substantial portion of their total annual sales. While these factors may explain the importance of their grievance to the members of the plaintiff class, I do not think they add to or detract from their constitutional argument.

I would order the entry of a judgment declaring that G. L. c. 136, § 6 (29), is unconstitutional so far as it fails to exempt members of the plaintiff class who compete with exempt stores in the sale of the same categories or items of goods.

APPENDIX

General Laws c. 136, §§ 1, 5, as appearing in St. 1962, c. 616, § 2, and § 6 (amended through St. 1975, c. 697), reads:

Section 1: "Sunday shall be a common day of rest. Sections one to eleven, inclusive, of this chapter may be cited as the Common Day of Rest Law."

Section 5: "Whoever on Sunday keeps open his shop, warehouse, factory or other place of business, or sells foodstuffs, goods, wares, merchandise or real estate, or does any manner of labor, business or work, except works of necessity and charity, shall be punished by a fine of not less than twenty dollars nor more than one hundred dollars for a first offense, and a fine of not less than fifty dollars nor more than two hundred dollars for each subsequent offense, and each unlawful act or sale shall constitute a separate offense."

Section 6: "Section five shall not prohibit the following:

"(1) Any manner of labor, business or work not performed for material compensation; provided, no public nuisance is created thereby.

"(2) The opening of a store or shop and the sale at retail of foodstuffs therein; provided, not more than a total of three persons, including the proprietor, are employed therein at any one time on Sunday and throughout the week.

"(3) The use or repair of any way or bridge, or the payment and collection of any toll incidental thereto.

"(4) The conduct of any public service the continuing operation of which is necessary for the maintenance of life, such as, but not limited to, the operation of municipal water and sewage disposal systems, the operation of hospitals and clinics, or the necessary services of physicians, surgeons, dentists and the like.

"(5) The making of emergency repairs for the purposes of immediate and necessary protection of persons, or property including realty, or the towing of any motor vehicle or boat for such purpose.

"(6) The manufacture, sale or distribution of steam, electricity, fuel, gas, oxygen, hydrogen, nitrogen, acetylene, carbon dioxide and the calcining of lime, manufacturing processes which for technical reasons require continuous operation, and the processing of checks, items, documents or data by a bank or trust company.

"(7) The operation of radio and television stations; the operation of telephone and telegraph systems; or the preparation, printing, publication, sale and delivery of newspapers, or the taking of pictures.

"(8) The opening and operation of any secular place of business not otherwise prohibited by law if the natural person in control of the business conscientiously believes that the seventh day of the week, or the period which begins at sundown on Friday night and ends at sundown on Saturday night, should be observed as the Sabbath, and causes all places of business in the commonwealth over which he has control to remain closed for secular business during the entire period of twenty-four consecutive hours which he believes should be observed as the Sabbath, and actually refrains from engaging in secular business and from laboring during that period.

"(9) The showing for sale or for rental of non-commercial real property to be used for residential purposes.

"(10) The opening of art galleries or the display and sale therein of paintings, objects of art, catalogues and pictures.

"(11) The operation of libraries.

"(12) The operation of public bathhouses.

"(13) The operation of boats for purposes of non-commercial fishing and recreation, or the sale of bait for fishing.

"(14) The catching or gathering of seafood and fresh water fish not otherwise prohibited by law.

"(15) The letting of horses, vehicles, boats or aircraft for pleasure.

"(16) The sale and rental of sporting equipment and clothing on premises where the sport for which the equipment or clothing to be sold or rented is carried on.

"(17) The retail sale of fuel, gasoline and lubricating oil.

"(18) The retail sale of tires, batteries and automotive parts for emergency use.

"(19) The operation of a pleasure vehicle or the piloting of an aircraft.

"(20) The sale at retail of growing plants, trees or bushes, and articles incidental to the cultivation of such plants, trees or bushes; and the retail sale and delivery of cut flowers.

"(21) The cultivation of land, and the raising and harvesting of agricultural products and fruit, and the making of butter and cheese.

"(22) The sale, for consumption off the premises, of food prepared by a common victualler licensed under other provisions of law to serve on Sunday.

"(23) The selling or delivering of kosher meat or fish by any natural person who observes Saturday as the Sabbath by closing his place of business from sundown Friday to sundown Saturday.

"(24) The making and baking of bakery products and the sale thereof in a shop or store.

"(25) The retail sale of tobacco products, soft drinks, confectioneries, baby foods, fresh fruit and fresh vegetables, dairy products and eggs, and the retail sale of poultry by the person who raises the same.

"(26) The sale and delivery of ice.

"(27) The retail sale of drugs and medicines and the retail sale or rental of mechanical appliances prescribed by physicians or surgeons, and the retail sale of personal health and sanitary supplies.

"(28) The retail sale of greeting cards and photographic films.

"(29)·The sale, at retail, of gifts, souvenirs, antiques, hand crafted goods and art goods, in an establishment primarily engaged in the sale of such merchandise, or on the premises of a licensed common victualler.

"(30) The opening of a store or shop primarily engaged in the retail sale of pets, and the sale therein of pets and articles necessary for the keeping, care and feeding of pets.

"(31) The transport of goods in commerce, or for a consideration, by motor truck or trailer, between the hours of midnight Saturday and eight o'clock in the morning Sunday and between the hours of eight o'clock in the evening and midnight Sunday.

"(32) The transport of goods by rail, water or air; or the loading or unloading of the same.

"(33) The transport of persons by licensed carriers and all matters incidental thereto, including the operation of all facilities incidental thereto.          .

"(34) The transport or processing of fresh meat, fresh poultry, fresh fish, fresh seafoods, fresh dairy products, fresh bakery products, fresh fruits or fresh vegetables, ice, bees, or Irish moss, when circumstances require that such work be done on Sunday; or all return trips necessitated thereby.

"(35) The transport of livestock, farm commodities and farming equipment for participation in and return from fairs, expositions or sporting events.

"(36) The operation of a lodging place, including the letting of

rooms and all services necessary and incidental to the letting of rooms.

"(37) The carrying on of the business of bootblack before eleven o'clock in the morning, provided that such business may be carried on at any time at public airports.

"(38) The employment for a consideration of musicians in parades by any post or camp of an incorporated organization of veterans of any war in which the United States of America was engaged, or by any incorporated civic, religious or fraternal organization, or by any company or association of policemen or firemen.

"(39) The necessary preparation for, and the conduct of, events licensed under section four, or activities as to which, under the provisions of paragraph (7) of section four, sections two, three and four do not apply.

"(40) Any labor, business or work necessary to the performance of or incidental to any religious exercises, including funerals and burials, the execution of wills or codicils, the preparation of contracts, the execution of federal, state or municipal tax returns or reports, the preparations for trials by lawyers or any other activity not prohibited nor required to be licensed on Sunday.

"(41) Work lawfully done by persons working under permits granted under section seven.

"(42) The conduct of the business of an innholder or common victualler.

"(43) The conduct of any business licensed under chapter one hundred and thirty-eight which may be conducted on Sunday in accordance with the provisions of said chapter.

"(44) The operation of a car-washing business between eight o'clock in the forenoon and one o'clock in the afternoon, provided that such business may be carried on at any time if not more than a total of two persons are employed therein at any one time on Sunday and throughout the week.

"(45) The operation of a coin-operated self-service laundry.

"(46) The operation of a coin-operated car-washing business.

"(47) The sale of tickets or shares for the state lottery.

"(48) The operation of a self-service auto repair center.

"(49) The transport of amusement devices, such as carousels, ferris wheels, inclined railways and other similar devices, concessions stands and tents from one location to the next between eight o'clock in the forenoon and one o'clock in the afternoon."